## ALLIED PRODUCTS CORPORATION v. WHITMAN & BARNES, Inc.

### No. 5341.

District Court, E. D. Michigan, S. D.
Oct. 18, 1937.

Stuart C. Barnes and Barnes, Kisselle, Laughlin & Raisch, all of Detroit, Mich., for plaintiff.

Clarence B. Zewadski, Whittemore, Hulbert & Belknap, and Allen R. Whittington, all of Detroit, Mich., and Harold G. Capron, of Chicago, Ill., for defendant.

TUTTLE, District Judge.

There are two patents in suit; claims 2, 3, 5, 6, and 7 of Richard, et al., reissue

patent 18,401, March 29, 1932 (see[1] for claims), and claims 1–6 of Richard reissue patent 18,395, March 22, 1932 (see[2] for claims). The first-mentioned patent will be called "the first patent," and the other patent "the second patent."

[1] Richard, et al. reissue patent 18,401, March 29, 1932.

Claim 2. In a retainer for punches, dies and similar tools, a base, a centrally apertured retainer detachably secured to the base, the retainer also having an angular aperture opening thereinto, a spring-pressed ball in the said angular aperture, and a tool having a shank provided with an arcuate groove of a radius greater than the radius of the ball in the side thereof engaged by the ball when the shank is seated against the base in the said aperture of the retainer.

Claim 3. In a retainer for punches, dies and similar tools, a base, a centrally apertured retainer removably secured to the base, the tool having a shank adapted for insertion in the aperture of the retainer into engagement with the base, the retainer also having an aperture in the wall thereof extending at an angle to the longitudinal axis of the central aperture and opening thereinto, there also being an opening in the retainer extending from the angular aperture through the face of the retainer, a ball fitting within the angular aperture, a spring forcing the ball to extend partially into the central aperture of the retainer, a recess formed in the surface of the tool shank having a face at an angle to the axis of the tool against which the ball engages when the shank is seated against the base, the aperture extending through the face of the retainer permitting insertion of an instrument to withdraw the ball from engagement with the tool.

Claim 5. In a tool retainer, a base, a centrally apertured retainer detachably secured to the base, the retainer also having an angular aperture opening into the central aperture, a spring-pressed ball in the said angular aperture and a tool having a shank adapted for insertion in the central aperture to engage the base, said shank having an arcuate groove on one side only, said groove being arcuate in form both longitudinally and transversely of the axis of the shank, the groove transversely of the shank being at its deepest part substantially of the same radius as the ball and longitudinally being formed on an arc of a radius greater than the radius of the ball.

Claim 6. In a retainer for punches, dies and similar tools, a base, a centrally apertured retainer secured to the base, the tool having a shank adapted for insertion in said aperture, the retainer also having an aperture in the wall thereof extending at an angle to the longitudinal axis and opening into the central aperture, a spring-pressed ball in said aperture said tool shank provided with an arcuate groove in one side thereof of a radius greater than the radius of the ball in which the said ball engages.

Claim 7. In a retainer for punches, dies, and similar tools, a base, a centrally apertured retainer, removably secured to the base, the tool having a shank adapted for insertion in the aperture of the retainer into engagement with the base, the retainer also having an aperture in the wall thereof extending at an angle to the longitudinal axis of the central aperture and opening thereinto, there also being an opening in the retainer extending from the angular aperture through the face of the retainer, a ball fitting within the angular aperture, a spring forcing the ball to extend partially into the central aperture of the retainer, a recess formed in the surface of the tool shank having a face at an angle to the axis of the tool against which the ball engages when the shank is seated against the base, the opening extending through the face of the retainer permitting insertion of an instrument to withdraw the ball from engagement with the tool, the said ball being arranged for a wedging engagement with said angular face of the recess in the tool and with the retainer at any position of the tool relative to the retainer within a given range, so as to provide a lock against any withdrawal when the tool is in engagement with the said base, and whereby the tool is locked immovable in the retainer.

[2] Richard reissue patent 18,395, March 22, 1932.

Claim 1. In a retainer for punches, dies and similar tools, a member having an aperture for a tool shank or body, a lock member having a seat in the said first named member and having a part movable into the aperture for the shank, said tool shank having an arcuate notch formed therein on one side, the radius of which is greater than the radius of the part of the lock member turning thereinto and the axis of which is eccentric to the axis about which the lock member turns whereby by a mere turning of the lock member on its axis it may assume a wedging relation relative to the notch to prevent longitudinal movement of the tool in its aperture, and a spring tending to turn the lock member on its axis to locking engagement with the notch

The first patent is for a tool and die retainer. A socket for the punch or die is provided in the retainer. A passageway enters this socket at an acute angle. In this passageway is a spring-pressed ball. A tool or die is adapted to be slipped into the

of the shank, the said first member, lock member, and notch of the tool being so complementally formed and arranged as to hold the tool shank from rotative movement in its aperture in said first member.

Claim 2. In a retainer for punches, dies and similar tools, a member having an aperture for a tool shank or body, a lock member having a seat in the said first named member and having a part movable into the aperture for the shank, said tool shank having an arcuate notch formed therein on one side, the radius of which is greater than the radius of the part of the lock member turning thereinto and the axis of which is eccentric to the axis about which the lock member turns whereby by a mere turning of the lock member on its axis it may assume a wedging relation with the notch to prevent longitudinal movement of the tool in its aperture, and means tending to turn the lock member on its axis to locking engagement with the notch of the shank, the said first member, lock member, and notch of the tool being so complementally formed and arranged as to hold the tool shank from rotative movement in its aperture in said first member.

Claim 3. In a retainer for punches, dies and similar tools, a member having a cylindrical aperture providing a sliding fit for a cylindrical tool shank or body, a lock member having a seat in the said first named member at one side of the said aperture and having a part movable thereinto, said tool shank having a notch formed therein on one side into which the lock member may turn when the notch is in registration therewith, the surface of the notch being so shaped relative to the lock member that a mere turning of the lock member on its axis causes a wedging engagement with the notch to thereby force the tool shank into pressure engagement with that side of its aperture opposite the lock member, and a spring tending to turn the lock member on its axis to engage the notch in the shank, the said first member, lock member and notch of the tool being so complementally formed and arranged as to prevent rotation of the tool shank in its aperture.

Claim 4. In a retainer for punches, dies and similar tools, a member having a cylindrical aperture providing a sliding fit for a cylindrical tool shank or body which is arranged to abut a tool seat at one end of said aperture, a lock member arranged to turn on a substantially fixed axis which lies crosswise of said aperture and having a seat in and by which it is pivoted in the said first named member at one side of the said aperture and having a tool engaging part movable thereinto, said tool shank having a notch formed therein on one side into which the lock member may turn when the notch is in registration therewith, the surface of the notch being so shaped and located when the tool abuts the seat, relative to the tool engaging part of the lock member and its center of rotation that a mere turning of the lock member on its axis causes a wedging and jamming engagement of said tool-engaging part of the lock member with the wall of the notch to thereby force the tool shank into pressure engagement with that side of its aperture opposite the lock member, a spring tending to turn the lock member on its axis to engage the notch in the shank, the said first member, lock member and notch of the tool being so complementally formed and arranged as to prevent rotation of the tool shank in its aperture and the lock member being relieved, on the tool side, from the full dimensions of the circle in which it swings whereby the said spring pressed lock member automatically locks the tool from withdrawal from its seat in any one of various positions the tool shank may at any time take, within a given range, when abutting said seat and to permit the tool to be entered in the aperture and seated against the tool seat and permit the tool engaging part of the lock member to turn into the notch, and the said locking member being further arranged so it can be, when desired, turned out of the notch in the tool to release the same.

Claim 5. Supporting means for a punch or the like of a type having a shank which is notched to provide an engaging surface inclined from the side of the shank inwardly thereof and away from the supported end of the shank, comprising a retainer having an aperture for receiving the shank, the supported end of the shank being arranged to abut against a seat, a pivoted lock member, a seat in the retainer in which the pivoted lock member is seated and journaled, said lock member having an engaging part which swings in an arc which projects into the aperture and conflicts with the said inclined surface of the notch of the tool shank when said tool shank abuts against said seat, said lock mem-

socket. That tool and die is provided with a notch into which the spring-pressed ball drops when the notch registers with the ball. The tool or die can be pushed into the socket until it meets the bottom of the socket, but if effort is made to remove the tool, the ball firmly resists this effort for the reason that the wall of the notch and the wall of the passageway, where contact is made with the ball, converge, and any effort to extract the tool causes the parts to jamb. The tool may be easily released by inserting a pin or rod through an aperture leading into the ball passageway. By pushing on the rod, the ball can be caused to travel up the passageway and release the tool.

The second patent involves the same general principle of operation, but, in place of a ball and an angular guideway for the ball, it discloses a half-cylinder locking member which turns in a fixed cylindrical socket. The locking member cannot travel. It simply turns. It operates on the principle that the center on which the curved notch is struck is, at all positions, eccentric to the center on which the cylindrical locking member rotates. The arc of the notch is also greater than the arc of the cylinder. The spring tends to rotate the cylindrical locking member into the notch. This device works on the same principle as the retainer of the first patent. They both involve the principle of the so-called overrunning clutch; that is, one member may rotate upon another member in one direction, but if one tries to reverse this rotation, the parts lock immediately by reason of the clutching member, ball, disc, pawl, or other mechanical equivalent getting jambed between two converging surfaces, one of which is moving relatively to the other.

The defendant operates under the King patent 1,910,296, May 23, 1933, under which it is licensed. In this patent there is disclosed a pivoted dog or pawl which, in its general form, somewhat resembles a dumb-bell. It is spring-pressed into a notch in the shank of the tool. One end of this dumb-bell or pawl pivots this locking member so it only swings and does not travel. The other end of the dumb-bell or pawl contacts with the surface of the notch in the tool. This pawl can be freely pushed out of the way as the tool is inserted into the socket, but when the socket registers with the pawl, it immediately springs back into the notch and locks the tool firmly in place when the tool has reached the limit of its movement into the retainer. Any attempt to remove the tool is immediately resisted. If the tool, by reason of wear or denting of the headplate, feeds into the socket a slight distance farther, this pivoted pawl immediately takes a new grip in the bottom of the notch and locks the tool in the new position. In other words, it has the automatic take-up action taught in the first patent.

The claims of the first patent call for an aperture in the wall "extending at an angle to the longitudinal axis of the central

ber being relieved adjacent to the said engaging part to clear the aperture for the tool shank for insertion and removal of the tool and to clear the wall of the notch of the tool shank when in locking position whereby the engaging part only may swing into jamming engagement with the said inclined engaging surface of the tool shank, and means exerting a swinging tendency upon the lock member to swing the said engaging part thereof into engagement with the inclined surface of the tool shank whereby the tool shank is urged toward the wall of said aperture opposite the lock member and held at all times against the seat by a jamming action between the said inclined engaging surface and said engaging part.

Claim 6. A punch or other tool retainer having in combination a member provided with an aperture arranged to have, when in use, at one end a tool seat, and to form a socket for a punch or other tool having a notch in the side thereof, said member having also an opening in one side of said aperture, a locking member seated in said retainer to turn through the said opening on a substantially fixed axis and which is arranged crosswise of the said aperture, the said locking member having a tool-engaging portion, the locking member ahead of the tool-engaging portion being relieved to permit the tool to be inserted in the aperture and also to permit the tool-engaging portion to enter the notch of the tool and jam with the wall thereof to lock the tool from any withdrawal movement through a range of positions along the wall of the notch where contact between the notch wall and the engaging portion of the locking member may be made in the seating of the tool against the said tool seat, and means tending to automatically turn the locking member into the tool socket, said lock being arranged to be withdrawn from the tool socket to permit release of the tool from the retainer.

aperture." They also call for the ball fitting into this angular aperture.

The controversy involved in this lawsuit largely centers around whether or not the defendant, with its swinging pawl and ball socket, has the mechanical equivalent of the first patent's angular aperture and ball. The meritorious question is whether the claims of the first patent are entitled to such a range of equivalents as will permit defendant's pawl and socket to be construed to be the mechanical equivalent of the angular passageway and the ball. The defendant also has strenuously contended that the plaintiff's commercial device is not built according to the teachings of the patent because, instead of a notch arcuate lengthwise of the tool, it has a notch that, in the main, is not arcuate lengthwise of the tool, but merely angular. The lower end of plaintiff's notch is formed on a radius.

■ There are difficulties inherent in this lawsuit. It is filled with trouble for plaintiff. I recognize that. At the outset, I give to these patents the presumption of validity. About all that means where, as here, validity is contested, is that the court ought to keep its eyes open and be willing to see an invention, if it is present, instead of just looking for reasons to defeat the patent. Even if we do that, there will be few worthwhile patents to be found in the great mass granted by the Patent Office.

I believe that the patentees built a machine on which they have a valid patent. I find that a device made according to the drawings and specifications of the first patent would work, if in the interpretation of the drawings and specifications, ordinary mechanical skill and common sense were used. I am satisfied that the patentees did build such a tool and that then, having made the thing in the shop, they went to their lawyers to get a patent that would cover the novelty and usefulness of the thing they had invented.

The thing they really built, and the thing they were thinking about, was a heavy-duty punch, a punch not to be used with the hand and a hammer, but a punch intended for use in a heavy machine that would come down with tons of force and punch a hole through thick sheets of steel, a tool that they could use with many others like it to punch many holes at the same time, a machine that, if one punch broke or got dull or for any other reason needed to be removed, they could slip out one punch readily and put in a new one, and go ahead with the work.

After the very first stroke, undoubtedly, that punch would be driven a little farther into the holder, and when that was done, it was desirable that it be held in its new position. It is important that it be held in that new position because everyone recognizes that it is bad to have play in the chuck. That play would increase on each stroke and, ultimately, ruin the machine. So it was important that the tool, however far it was inserted, should be held firmly in that new position.

That was the problem, that is the kind of a tool that the patentees built, that is the kind of a patent the Richards were trying to get, that is the kind of a tool they disclosed in their patent, and I think that is the proper interpretation of the patent granted.

They had an additional idea that it would be desirable that the punch should not turn in its socket.

Tools had been built that could be taken out and put in and that would bear tons of pressure and punch the hole, and that would stand the strain of pulling them out, but none of those tools that had been previously made had the automatic take-up. This tool automatically feeds into and holds another position as the parts wear or the backing plate is dented. There had been tools made that had automatic take-up, but they all had, on the back stroke or stripping stroke, only the strength and resistance such as they were able to get through friction against the plane surface of the tool.

There had also been locks in which, by various means, a locking member was forced into the tool, so that it had more than friction. These punches could not be pulled out without metal being destroyed because there was the locking member in the notch, and the tool could not come out without either breaking the locking member or plowing its way through the tool. But they were the kind that either would lock only in one place, or if they did lock in several places, they were not automatic. One could stand there with his hand and keep tightening them, but it was particularly desirable in this kind of a tool that there should be an automatic lock, and that it should be, within ranges, an automatic locking at any place and an automatic locking of such great strength that it furnished much more resistance than simply friction; that great and powerful resistance that one gets when metal must either break or be crushed.

That is the kind of a tool that the patentees made, and the kind of a tool they showed in their patent, and their claims read on that kind of a tool. It is a workable tool and a very desirable tool, and the first tool that did all three of those things; namely, lock in any place, lock in such a way that the strength of the metal was involved instead of simply friction, and lock automatically. That is the combination of desirable results which was new over the prior art.

■ Richard et al., having done that new and useful thing, this court is justified in being unusually diligent in order to save the claims, if it can be done, on any logical and proper theory. The claims should be given a broad meaning, and when it comes to the question of infringement, the doctrine of equivalents should be liberally applied.

It was simple to make a device which would lock at any place. We had many things which did that. We had the safety fastener which you could push in as far as you liked, and it would stick unless you released it. Every Michigan hunter that puts his deer license seal on the buck's horn has an example of that kind of a lock. He turns the tongue around under the horn, sticks it through the slit in the head of the seal, and he can stick it in as far as he likes, but he cannot pull it back at all, and the state of Michigan is protected against his putting it on one deer, and then taking it off and using it on another deer. It is also easy to make a lock that will go into the side of anything that you want to lock and lock it in a particular place. It is also easy to change what is manual over into automatic. We have that in a thousand and one places in the world.

This new tool of the first patent has been and is now of very great service in the automobile industry. I do not mean to suggest that we could not have automobiles without this Richard et al. invention. They had previously made tool retainers which would hold the punch without this patented invention; but, on the other hand, it is very valuable and helpful to have these punches for punching many holes, and to be able, just like snapping one's finger, to take out one of those broken or dull punches and put in a fresh one and go ahead with the work, to be able to have it work and wear without vibrating, to have it held in such a manner that it is not likely to wear out, and, if it does wear or yield on the heavy and alternating pressures and pulls, to catch it automatically in the new position. The tool is valuable, and it is so worthwhile that it means much to this art in dollars and cents.

If the lawyers in this case were to write the claims for this patent to-day with all of the knowledge that use of the tool has taught, they could produce claims that would make my duty much easier than it is. When the application was made in November 19, 1919, the invention made and disclosed was entitled to very broad and valuable claims.

I have studied the prior art, and I have given my best thought to this tool that I have been discussing. I am fully convinced that the tool invented was new and very useful. In actual use, it has met a need and rendered valuable service.

There is nothing in the prior art to prevent a valid patent with broad claims for the invention. The drawings of the patent show the machine. The claims of the patent are supported by the drawings and the specifications. When I first looked at defendant's tool, I thought that it did not infringe. The patent has grown on me with study. There was an opening in the field. It made a long forward step in the art in which it has been much used to great advantage.

■ The question is very properly raised as to whether the thing commercially made by this plaintiff is the thing shown in its patent. With my idea that this was a thing of so much value, I reach the conclusion that I ought to give breadth to the claims. I think equivalents ought to be used, not only in construing the claims of the patent to determine whether or not they are infringed, but I think that same general method of interpretation should be used in determining whether or not the thing invented by the patentees has gone into big use.

While the plaintiff in its commercial device has changed the form of the structure a little bit, I think so well of what was done, I think so well of the need for it, and the valuable service it has performed, that I give credit to the patent for the modified structure. I think the first patent is entitled to the credit for all that plaintiff has done commercially with the so-called modified structure.

The things done following the first patent were so simple that I give no credit to the second patent. I do not think there is any invention in it. The reason is because

of the breadth I gave to this first patent, the value I attach to that first invention. I do not attach much weight to the little modifications that plaintiff has made in the commercial device. I expect manufacturers to do those things. I think they ought to do them, and it does not lessen the good opinion I hold of this first patent.

I have stated the three things that the patentees did bring together, and that they needed to do in order to accomplish the result that I have been talking about. They showed it in the first patent in the particular way of a groove in the tool, which was a double arc, longitudinally of the tool and crossways of the tool, and, of course, this crossways arc was what they were using and thinking about to prevent the tool from revolving on its axis.

Perhaps the novelty of the crossways arc was a little more emphatic in their mind than the longitudinal arc, and it is from plaintiff's standpoint unfortunate now that certain things were said in that first patent as to how you could build it without the groove at all. I do not think I ought to let that stand in the way of holding the reissue of the first patent good, or holding the claims good as they have been reissued. So far as I am concerned, they were worded originally in a way which would have been sufficient and valid, if there had not been a reissue.

■ Technicalities often result in misfortunes. We must have technicalities in order to protect people, but I think the court ought, when it sees a worth-while invention, to try to protect the rights of the inventor. That is what I am doing here. I think this valuable patent can be saved, and should be saved.

The Richard brothers made this double arc notch at the side of the tool and they had a trough at an angle to the longitudinal axis of their tool that brought a little ball down so that, as soon as the tool was in proper relation to the trough, the ball would move in and they put back of the ball a spring to force it down. They used the same thing for the die below. They were not depending on that spring for the purpose of friction. The spring did not have strength enough to cause any friction or to do any of the work at all, more than a man's finger would, if he pushed in a lock. It is a thing that helped to produce the automatic feature, but not all of it, by any means. There is much else in this invention that contributes to the automatic feature, and one is the fact that it is so arranged that a ball coming down in a trough to the edges of a cylindrical opening right adjacent to that ball, is crowded into a converging passageway and locks on the pull. So long as the tool is moving into the opening, the ball is being rolled up into the passageway, and there is lots of room to insert the tool into the opening, but as soon as you start to pull it the other way, the ball locks the tool, not because of the spring forcing it in; the spring just brings the ball to the place where it gets caught. It is like the man feeding the threshing machine brings the bundle of wheat up to the cylinder and the cylinder grabs it and pulls it through. So here the spring just pushes the ball up there, and the converging route, one side of which is moving towards the narrower place, just rolls the ball in there and binds it, so it is more than just the spring that makes it automatic.

It is what happens after the spring has brought it up there that really does the automatic locking. Richard et al. had the notch arc-shaped, and I think it would work. The structure was such that, mechanically speaking, the little ball was at all times saying to the tool, "Come in as far as you like," but just the instant the tool started to leave, the ball said, "No, you cannot go in that direction at all."

I do not think I ought to bother very much about centers of gravity, concentricity, and eccentricity, and all those things which are subjects for very interesting study as to why this tool works as it does. The inventors did not approach it from that angle. The mechanics who have used and modified the invention have not bothered about those things. If a court attempts to do it from that angle, it will just get lost in a maze of mystery and mathematical logic.

There was no unusual merit in the ball and the diagonal route that led the ball to the desired place. If they were going to have a ball, they needed a diagonal trough, and if they were going to have the diagonal trough, they needed the ball, but as I look at the prior art and as I think about these things, I am convinced there were other old equivalents of the ball and trough which they could have used in the new combination with the same new and valuable results.

The ball, of course, goes with the angular trough and the angular trough goes with the ball. You would not think of having one without the other, so while they have made those two elements of their claim, I

could just as well think of them as one element because they necessarily go together.

In place of those two things, they could have had a tilting pawl, which I think is what the defendant has. I agree with the defendant, that it does not have any ball or any diagonal trough. They have, instead, the tilting pawl. The defendant has what looks to me more like a dumb-bell. One end of it is down in a corner which I call a seat, and the other end is diagonally up against a notch in the tool, and then held by a spring on the side of this locking member. It swings on one end of the dumb-bell as a pivot and drops down into the path of the tool, or what might be called the notch in the tool.

Another way would have been like plaintiff's second patent in suit, which I think is merely another equivalent, by having a cylinder at right angles to the tool, a notch in the tool, the cylinder cut out so that one could put the tool in and lock the cylinder into a new place.

These are three mechanical equivalents used for exactly the same purpose, whether we are talking about the extent to which plaintiff has used its patent, or whether we are talking about the extent to which the first patent has gone into commercial use, or whether we are talking about infringement by defendant.

■ I think that the first patent is good and that all of the five claims in suit are valid.

■ As to claims 2, 5, and 6, I hold them not infringed because they are limited as to the notch.

I do not attach much importance to the exact shape of the notch. The important thing in the notch is that when it catches and the tool attempts to come back, the notch side is getting smaller. The moving side is the tool side. Now, we have another side or a seat, depending on the mechanical equivalent used in order to get it into this jamb and lock. This patent is entitled to much breadth and leeway when it comes to defining whether the bottom of the notch is a strict arc of a circle or whether it is a tangent to the arc of a circle.

The important thing is that at every point where it is going to use the locking member, it should be converging, and converging at such an angle that the ball or equivalent locking member will not pop back. The same is true if one is trying to feed something into the wringer. There must not be too big a bunch in the clothes or the wringer cannot pinch the clothes and get started. There must be angle enough to catch the clothes and pull them in, and that is true with all these tools. There must be an angle that is acute enough so that the ball will not be thrown back, but will be caught and carried as far as it will go, and then lock. The same thing is true with a pawl or any of the equivalents.

The important thing is that with the wedge, whether it be a ball wedge or any other kind of a wedge, the angle is such that it can be caught and carried between sides that are converging. It is not important whether it be formed by a true angle or by a side which is arcuate, but so long as claims 2, 5, and 6 do define it in the terms of an arc and other claims are not so limited, I prefer to say that those claims are not infringed.

■ As to claims 3 and 7, I hold that when the defendants substituted the tilting pawl or the double ball or the dumb-bell with a seat at one end and the other end coming in contact with the notch of the tool, that it was doing just exactly what the first patent showed and stated in claims 3 and 7. These are mechanical equivalents.

There are two Supreme Court cases which, I believe, sustain my holding that defendant's structure comes within the claims under the doctrine of equivalents. One is the case of Winans v. Denmead, 15 How. (56 U.S.) 330, 14 L.Ed. 717, where the patentee had a claim for a body of a coal car "in the form of a frustum of a cone." It was held that a defendant who constructed the bottom of his coal car in the form of a frustum of an octagonal pyramid infringed the patent.

In Ives v. Hamilton, 92 U.S. 426, 429, 23 L.Ed. 494, the plaintiff had a patent on a cross-cut saw with a claim reading: " 'Giving to the saw in its downward movement a rocking or rolling motion, by means of the combination of the cross-head *working in the curved guides* at the upper end of the saw, the lower end of which is attached to a cross-head, working in straight guides and *pivoted to the pitman below the saw, with the crank-pin,* substantially as described.' " (Italics mine.)

Apparently, the claim called for two arrangements which the defendants did not, literally, have, to wit, a curved guide for the cross-head connected with the upper end of the saw, and a lower cross-head moving in a straight guide, the cross-head located

below the lower end of the saw. The defendants did not have a curved guide at the top, but had a crooked guide made up of a line broken into straight sections, one angularly related to another, and the defendants did not have their cross-head connected to the saw below the lower end of the saw, as stated in the claim, but had just the reverse; the lower cross-head was connected above the lower end of the saw. The court said:

"The substitution of guides at the top, made crooked by a broken line instead of a curved line, is too transparent an imitation to need a moment's consideration. A curve itself is often treated, even in mathematical science, as consisting of a succession of very short straight lines, or as one broken line, constantly changing its direction; and many beautiful theorems were evolved by the early mathematicians on this hypothesis. At all events, in mechanics, when, as in this case, a broken line is used instead of a regular curve, being deflected at one or more points by a very slight angle, and performing precisely the same office as a curve similarly situated, the one is clearly the equivalent of the other.

"The attaching of the lower end of the saw to the pitman below the cross-head instead of above it, and thereby getting the same movement as before by reversing the motion of the crank, is no change in principle. This is too obvious for discussion."

So here, I regard the defendant's swinging pawl or locking member socketed in the part-spherical recess the equivalent of what the patentees claim as a ball and angular passageway for the ball.

This patent uses inaccurate language where it refers to the convergence of two lines, one of which is an arc, as an angle. To be strictly accurate and still use the word "angle," it probably should have described that side of the angle as the tangent of the arc at the particular point. The meaning seems plain, and I do not think it affects the patent in any way or degree. If one side of an angle is changed into an arc

and an inventor is thinking about using that converging opening between the two sides, I do not consider it at all surprising that he should speak of it as the angle between the two sides.

The important thing was that it be tapering, and tapering in such a way that it would catch the locking member, whatever kind of a locking member it was, and pull it into the locking position.

■ The second patent, like any other patent applied for and issued after the first patent, does not affect the validity of the first patent in any way. It is urged that the second patent was obtained on a different theory than the one here urged. I hold that nothing contained in the second patent can in any way affect the first patent. This first patent must stand or fall on its merits as a patent. Other patents applied for after the application for this patent have no legal bearing on the first patent.

■ My holding as to the breadth of the claims of the first patent, and the proper application of the rule of mechanical equivalents, leads to the conclusion that the claims of the second patent are void. All that the second patent does is to disclose the cylinder which is a mechanical equivalent of what is shown in the first patent. The defendant uses the pawl which is another mechanical equivalent.

The decree shall declare claims 3 and 7 of the first patent valid and infringed, and claims 2, 5, and 6 of that patent not infringed. It will declare claims 1–6 of the second patent void. Reference will be made to Donald L. Quaife as special master to compute damages and profits for the infringement of claims 3 and 7 of the first patent.

■ This opinion may stand as my findings of fact and conclusions of law as required by Equity Rule 70½, 28 U.S.C.A. following section 723 in accordance with the practice sanctioned by the Court of Appeals in Briggs v. United States (C.C.A.6) 45 F. (2d) 479.