**BERRY et al. v. BOHN ALUMINUM & BRASS CORPORATION et al.**

**No. 7828.**

District Court, E. D. Michigan, S. D.

Sept. 30, 1939.

John H. Bruninga, of St. Louis, Mo., George B. Schley, of Indianapolis, Ind., and Alexander F. Baillio, of Detroit, Mich., for plaintiffs.

George F. Scull and Frank J. Kent, both of New York City, Karl B. Lutz, of New York City, and Rockwell Gust, of Detroit, Mich., for defendants.

TUTTLE, District Judge.

This suit involves the validity and infringement of patent to Berry, No. 1,877,490, application filed March 20, 1922, and patent granted September 13, 1932. Plaintiff Berry is the owner of the patent in suit and plaintiff General Motors Corporation is the exclusive licensee under the patent with the right to grant sub-licenses. Defendant Bohn Aluminum and Brass Corporation has manufactured and sold the accused pistons and defendant Nelson is associated with Bohn corporation, and has

cooperated with Bohn corporation in the design and manufacture of the accused pistons.

■ The claims in suit were 2, 4, 5, 12, 13, 14, 15, 16, 18, 34 and 35. Upon inquiry to counsel for plaintiff in open court, it was stated that plaintiff would be satisfied with a decision as to claims 5, 15, 18 and 35.[1] I don't want any doubt about those seven other claims. I am not going to pass on their validity. I am not going to pass on whether they are infringed. I dismiss them without prejudice.

So, now I have before me for consideration this patent with only claims 5, 15, 18 and 35, which are printed in the footnote.

This patent involves a piston. I cannot think of a piston without thinking of the cylinder into which the piston goes. The piston will not work without a cylinder. It has to do with an aluminum piston for use in an iron cylinder. The piston consists of a head, made of aluminum, with aluminum piers coming down from the aluminum head. Those piers contain bosses made of aluminum, with holes through the bosses to carry the wrist-pin. On either side of the bosses are skirt segments of aluminum, which skirt segments are separated from the head; and the skirt segments are connected to each other by two iron struts. Each strut passes through, and is embedded in, a boss. The ends of each strut terminate in the skirt segments. When the piston is completed, it is all one solid piece of metal; the struts, however,

being of iron and the other parts of aluminum. The specifications of the patent as a preferable embodiment describe struts of a lower coefficient of expansion than that of iron, but Claim 5 calls for a coefficient of expansion less than that of the metal of the head, i. e., aluminum.

This patent has had a long and stormy voyage for the purpose of determining into whose particular port it should arrive. The Patent Office, with the assistance of the Court of Customs and Patent Appeals and the assistance of this court, and the Court of Appeals for the Sixth Circuit, have emphatically charted it to the port belonging to Berry. I find that it belongs to plaintiff Berry and that he has assigned valuable rights therein to plaintiff General Motors Corporation.

■ Both parties have offered in evidence portions of the testimony taken before the Patent Office in the interference proceedings and defendant Nelson who was one of the parties to the interference testified before this court. In the recent case decided by the Court of Appeals for this Circuit, Cleveland Trust Company v. Otto Carter Berry and General Motors Corporation, 99 F.2d 517, 522, involving a case in which Jardine, who was in the same interference, contested priority with Berry, that court said:

"As to priority, every tribunal of the Patent Office and the District Court has held against Jardine. The question is one of fact which has been settled by the special tribunal with power to decide that

---

[1] Patent to Berry, No. 1,877,490, September 13, 1932:

Claim 5. A piston, comprising a head-part of nonferrous metal, wrist-pin bosses rigidly connected to said head-part, skirt segments, and members made of a metal having a thermal co-efficient of expansion smaller than that of the metal in said head-part, the extreme ends of said members being imbedded in said skirt-segments, and intermediate portions thereof being imbedded in the wrist-pin bosses, said members connecting said skirt-segments together and to said wrist-pin bosses.

Claim 15. In a piston, a head, a separate sectional skirt of aluminum alloy, and steel struts extending transversely of the piston pin bearings uniting the sections to each other and to the head, said struts having their opposite ends buried in the respective skirt sections, substantially as set forth.

Claim 18. In a piston, a sectional skirt, a head separate from the sections of the skirt, said head and skirt consisting of expansible material, and struts of relatively inexpansible material uniting said sections of the skirt to the head and to each other, said struts extending transversely of the piston pin bearings and having their edges adjacent said piston pin bearings buried in the material of said bearings, substantially as set forth.

Claim 35. A piston having a head, piers depending from the head, piston pin bearings formed in the piers, cylinder-bearing portions on opposite sides of the piston, a pair of chordal struts, each of said struts extending between the cylinder-bearing portions, the intermediate portion of each strut being surrounded by the material of a pier, there being an integral connection between each of the cylinder-bearing portions and each pier.

question. The decision of the Patent Office, therefore, must be accepted as controlling unless the contrary is established by testimony which in character and amount carries thorough conviction. Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657. It suffices to say that there is no testimony in this record establishing that Jardine is prior to Berry."

So here there is no testimony in this record establishing that Nelson is prior to Berry as to the subject-matter of the claims of the Berry patent here in issue, and "the grant of letters patent is prima facie evidence that the patentee is the first inventor of the device described in the letters patent, and of its novelty", Morgan v. Daniels, 153 U.S. 120, 123, 14 S.Ct. 772, 773, 38 L.Ed. 657.

■ The sketches contained in the Nelson diaries of 1918 and 1919, the drawing of the four-strut piston of defendants' exhibit 45 bearing date of April 8, 1921, even if proved, do not warrant a contrary holding. The evidence, graphically summarized on plaintiffs' exhibit 379, a blackboard chronology of Nelson pistons from March, 1919, on, shows that from the four-strut piston of March, 1919, to the first piston like that of Berry made by Nelson September 13, 1923, and even to the first application on such a piston filed by Nelson June 5, 1923, Nelson was engaged in the making and testing of single-strut and disc-strut pistons which are not the pistons of the Berry patent. This did not constitute such diligence as is required by law (R.S. § 4920, paragraph Second, Title 35, U.S.C.A. § 69; Christie v. Seybold, 6 Cir., 55 F. 69), in order to overcome Berry, who filed his application on March 20, 1922, and who made a drawing on September 28, 1921 (Plaintiffs' Exhibit B). The Patent Office tribunals and the Court of Customs & Patent Appeals so found, and further that Nelson's working on the single-strut and disc piston did not constitute the diligence required to adapt and perfect the subject matter of the invention here in issue. The four-strut piston was merely an abandoned experiment and the Patent Office tribunals and the Court of Customs & Patent Appeals so found. The evidence shows that Nelson had really abandoned the four-strut piston of Exhibit 20 and the piston of Exhibit 45 when Berry filed on March 20, 1922.

I realize that the Canadian Court has decided the question of priority in favor of Nelson and against Berry. But the Canadian patent law does not have the provision of R.S. § 4920, as enacted in 1836, which requires a defendant to show as to the patentee

"That he had surreptitiously or unjustly obtained the patent for that which was in fact invented by another, who was using reasonable diligence in adapting and perfecting the same."

I now proceed to the question of validity. The prior art contained many all-iron pistons, to work in an iron cylinder. It contained many all-aluminum pistons, to work in an iron cylinder. It contained aluminum pistons, with a single iron strut. It contained an aluminum piston with an iron ring or disc inside of the piston to try to make use of the difference in the heat expansion coefficient between iron and aluminum. Patent No. 1,438,132 to Nelson, granted December 5, 1922, shows a simple iron strut as well as a multiple of iron struts, two or four, all close to the center and not out in the bosses.

In considering that prior art, it is necessary to have in mind that even with an iron cylinder and an iron piston, there are some problems in the way of scoring. If one could start in with an iron cylinder, and an iron piston within the iron cylinder stationed exactly the distance away from that cylinder that was desired for good operation, if they were both heated uniformly, the piston would follow the cylinder as both expanded and there would be no problem of scoring. But one of the difficulties is that in actual practice there is not absolute uniformity of heat. The piston is the heart of the whole machine, and the head of the piston is heated first. The heat from the piston passes to the cylinder. The heat travels from the top of the cylinder farther down the cylinder and the heat in the top of the head of the piston travels downward to the piers and bosses of the piston. The heat is generated by the explosion which occurs just above the head of the piston and in the top of the cylinder.

The cooling medium is the water or air, or whatever surrounds the cylinder. The heat flows into the cylinder and from the cylinder into the surrounding water, if it is cooled by water. In actual operation, the piston is undoubtedly often hotter than the cylinder. Yet under some circumstances the cylinder, or at least some part of it, might be hotter than the piston. The tem-

perature of the head of the piston is going to be different from that of the skirt.

The conditions of heat are going to be different in mid-winter at Sault Sainte Marie, Michigan, than they are at Key West, Florida. The problem is one which deals with different and varying conditions.

In actual practice, pistons are made in quantities and then fitted to a particular cylinder for a particular use. The problem of manufacturing pistons is more like making ready-made clothes and then having the fitter in the store fit them to the man with one shoulder a little down or some other peculiarity or special need than it is like the tailor who makes the individual suit to fit the individual man in every case.

They are manufactured and then cam-ground after they are manufactured. The cam-grinding, or the fitting of them for the particular need, is so separate that it may be done in another shop and at another time, and after the first work of casting the piston is entirely completed. Having cam-ground the piston to the exact shape desired, thousands are ground in exactly the same form.

It is my opinion that one force and one principle which has entered into all pistons and has always been helpful is the fact that the cylinder surrounding the piston is the final force which makes the piston get into the right shape. The piston should be constructed in such a way as to use that force of last resort just as little as possible.

If that force of the cylinder, ever present and ready to serve, is used too much and the pressure of the piston against the cylinder is too great, then scoring results.

With the iron cylinder and the all-iron piston, they get along pretty well because as they get hot they expand equally, the one following the other except for different conditions which I have described. I don't think any of the mathematicians' pencils are going to be so accurate that the engineer can specify a piston which will not press the cylinder with varying forces. I am not now talking about guiding. I know the cylinder is going to act as a guide for the skirt, and the piston.

If the piston is made of the same kind of material as the cylinder, then the cylinder is just as likely to score as the piston, and it would be more serious to score the cylinder than it would the piston.

One of the advantages of the aluminum piston is that it is of a material softer than the iron cylinder, and therefore it is not likely to score the cylinder. Another advantage is that it is lighter, and therefore makes a lighter piston.

Still a third advantage is that it is a better transmitter of heat, which means that it will carry off that heat which must come from the explosion at the head.

Like almost everything in this world, along with the advantages come some disadvantages. One of the disadvantages is that aluminum expands more rapidly than iron, and therefore if the all-aluminum piston is placed in an iron cylinder, so that it just fits properly when cold and leaves just the clearance that is desired for the oil film between the all-aluminum piston and the surrounding iron cylinder, then as the piston gets hot it will of course expand more rapidly than the iron cylinder and it will win the race—it will not only overtake it, but it will either freeze or score. The other remedy would be to make it so small and give it such a big handicap in the race that it could not catch the iron cylinder. If that were done, then we should have the slapping and the knocking, that they try to avoid, when it is cold; and only when it reached the extreme temperature would it be able to work without slapping.

The purpose of this patent is to make use of the aluminum piston and get the advantages of the aluminum piston and avoid the disadvantages.

Berry is not the first one to think of it. That thought is not Berry's. That thought belongs to three inventors prior to Berry. The iron ring or disc inside the piston had that big, broad idea; the single strut had that idea; Nelson had it when he was making his single strut in the middle, his two struts in the middle and his four struts in the middle. Then came Berry. It seems plain that he had plenty of room for a good patent. The prior inventors went into the wilderness of this art and discovered things which cannot be taken away from them, and Berry cannot get any credit for those things. We just gave him credit for the new roads he blazed leading from the old positions to which others had advanced. It seems plain to me from this record, and from looking at these pistons and thinking about it, that a single iron strut piston with the balance of aluminum will not work. The idea of getting the benefit of the dif-

ference in expansion of iron and aluminum from a single iron strut is not sufficient to do the difficult job. The record shows that a force of something like 400 pounds is likely to be thrust to one side and then the other side as this piston is forced up and down for the purpose of driving the crankshaft. The same part of the thrust surface of the piston is going to come in contact with the same place in the cylinder as it goes up and down a million times a day. If that thrust surface is held there by a single strut pressing right against the thrust surface, it seems plain that it is an undesirable piston.

The heat expansion advances the skirts very gradually, of course, and I am not thinking about the expansion as being any part of that 400 pounds thrust, but that 400 pounds thrust with a single strut banging away in one place suggests an undesirable thrust surface and an undesirable support for the thrust surface.

The single strut has never gone into commercial use in a big way. I don't think it ever will. Berry's thrust surface is supported at both ends and should be cam-ground so that it strikes first in the center. If it is sufficiently cam-ground, the thrust surface increases with expansion, which makes it all the easier for the thrust surface to avoid scoring. It matters not whether it is called hoop action or something else, the thrust surface, when properly cam-ground and held at both ends by struts, is a good thrust surface; and the thrust surface held by a single strut at the center point is a bad strut surface no matter how it is cam-ground. In my opinion, this conclusion is supported by the experiments, the weight of the testimony, and by common sense.

The only way to avoid the unyielding pressure opposite the single iron strut would be to cam-grind the skirt so it struck at the edges and the center was held away from the cylinder so far that on expansion the center of the skirt was never crowded out close to the cylinder and the thrust surface was never deformed so much that it actually bore against the cylinder in the center of the skirt. That looks like a bad thrust surface to me, with the two edges hitting and teetering around on the strut in the middle. No such piston was ever produced and it never went into use.

The drawing of the Berry patent shows his thrust surface round, with his supports at the edges, the two struts going through the bosses and striking the thrust surfaces out near the extremities of the skirts. It was, of course, necessary that the skirt or thrust surface be properly cam-ground in order to have it work properly.

The Berry patent does not specifically say that his piston should be round, but the specification says, page 2, lines 116-120:

"The rough piston thus produced is then finished in the usual way of pistons, to provide proper clearance for both the skirt segments and the head part".

The evidence shows that before Berry filed his application it was the practice to cam-grind aluminum pistons to make the skirt oval or eliptical with the minor axis along the line of the wrist pin axis and with the major axis in the middle of the thrust faces. (Stellman patent, No. 1,557,625, issued October 20, 1925, the booklet entitled "Pistons", Plaintiffs' exhibit 383, and the Franklin piston, Plaintiffs' exhibit 307A). Accordingly, "the usual way" clearly included cam-grinding as then practiced. Webster Loom Company v. Higgins, 105 U.S. 580, 586, 26 L.Ed. 1177.

The practical way is to make the thrust surface round and then cam-grind it. If it is properly cam-ground, then with the iron struts at or near the edges of the skirt it will be nearest to the cylinder at the middle part of the skirt. As it gets hot, the curve of the skirt becomes a larger circle; or, as some of the witnesses have described it, the edges of the skirt turn out and the thrust surface extends from the center towards the edges of the skirt and thereby the contact surface, which is close to, or touching, the cylinder, becomes larger.

Berry shows the round skirt. That is the way to build them and then cam-grind them. To go back to my ready-made clothing simile, Berry wasn't being the fitter in the ready-made clothing store, but he was making a piston to be cast in the right shape to be cam-ground by the fitter.

Berry was the first to teach the combination of the head of aluminum, the piers of aluminum, the bosses of aluminum, the skirt segments of aluminum, iron struts embedded in the bosses and contacting the skirt segments at the edges of the skirt segments for the purpose of making use of the coefficient of expansion of the iron in the strut adapted for cam-grinding in such a way that the first contact with the cylinder would be in the center of the thrust surface, and as the piston got hotter it would increase the thrust surface out from

its center. Berry was the first to do that, and to make possible those results in that way. I have in mind that he did not make one and put it in a car except experimentally, or sell one, but I am looking at this as a patent, for what it is worth, with the presumption of validity to which it is entitled.

■■ R.S. § 4886, 35 U.S.C.A. § 31, does not require an inventor to make a thing for which he applies for a patent as a prerequisite to obtaining a patent. The Telephone Cases, 126 U.S. 1, 535, 8 S.Ct. 778, 31 L.Ed. 863. Nor is commercial use by the patentee necessary to sustain a patent. Paper Bag Patent Case, 210 U.S. 405, 423, 28 S.Ct. 748, 52 L.Ed. 1122. Nor need the device illustrated in the patent be such as to meet commercial requirements. Hildreth v. Mastoras, 257 U.S. 27, 34, 42 S.Ct. 20, 66 L.Ed. 112; Sun Ray Gas Corp. v. Bellows-Claude Neon Co., 6 Cir., 49 F.2d 886, 889; Allied Products Corp. v. Whitman & Barnes, 21 F.Supp. 186, 190, this Court.

■■ The court should not subtract anything from what the patent clearly shows and what it is worth simply because the patentee has not manufactured the structure. In many cases, the court should add something in the way of liberal interpretation of a patent because it has gone into great use. I believe and hold that in this case there has been use by the infringers of what is disclosed and claimed by the patent. This patent disclosed and claimed a new and useful combination and it is entitled to what it shows and claims. The step from the ring of the Knight, Napier and Hartog patents[1] to the invention of Berry is far enough and useful enough to justify the allowance of those claims in suit.

There are two structures in the prior art which are more like Berry than the iron ring structures. I am talking about the step Berry took, and how difficult it was. I am trying to measure it by what this mythical mechanic, skilled in the art, could and would do. I do not think Mr. Nelson should be taken as a guide for what a skilled mechanic would do. He is a man of great genius and ability. Nelson would think of things which would not occur to a skilled mechanic. The single strut was not practical. I don't think the

iron ring of the prior art was practical. I am not now trying to determine how practical were the old things of the prior art, but how helpful they would be in leading one to the structure of Berry. I think the single iron strut is nearer to Berry than the iron disc or ring. I shall now try to measure the step from the single iron strut to the Berry double strut. In doing this, I should consider that the all-aluminum piston with the double aluminum strut and the aluminum piston with a single iron strut were both old in the art. The step was not so great by having the two as it would have been with either one alone. It can be said, of course, that all the mechanic skilled in the art needed to do was to take the all-aluminum piston with the two aluminum struts going from the skirt to the boss, and make those struts out of iron. It can be approached from the other way and said that all he needed to do was to take the old aluminum piston with the two steel struts in the middle of the piston and move them farther apart so that each was embedded in a boss. I shall now consider both of those steps. If in order to take either one of these two steps it is necessary to introduce a new element in the combination, that makes a new combination. If the step to that new combination is more difficult than the skilled mechanic would be able to take and the new combination is useful, then it is invention of the kind which should be rewarded and protected by a valid patent. I believe that these claims cover such an invention and that the patent is a good one. As is usually the case, each individual element can be found in the prior art.

The aluminum head is old. The aluminum pier is old. The aluminum boss is old. The aluminum skirts are old. The iron struts are old. It is, however, necessary to move the iron struts into a new place in order to perform the desired service. When the iron struts are so moved, they perform two new and useful services. One of these necessary and useful services is that the struts press the skirts at the proper place. The other new and necessary service is that the struts are embedded in the bosses. Both of those things are new and necessary, and Berry put them into his combination. That makes a good, new and useful combination. It cannot be found in the prior art. How difficult was it to

---

[1] Knight No. 1,418,719, June 6, 1922 Napier No. 1,525,316, February 3, 1925 Hartog No. 1,794,767, March 3, 1931.

discover this new and useful thing? It was necessary to change the aluminum struts to iron or to move those iron struts into new positions, both at their extremities and at their middle points. Where the struts hit the skirt segments is of even more importance than where they contact the bosses. Both of these things are necessary in order to make a good piston. They go together and both are necessary. The struts hit the skirt segments at the edges and pass through the bosses. It is the importance of both of these new elements which makes these claims so valuable and useful. Nelson is not simply a mechanic. He is a skilled inventor. He thought of this very thing, tried it, and abandoned it, as is shown by the testimony and as held by the Patent Office. Therefore, there is nothing done by Nelson in that regard which constitutes prior art or belittles the genius of Berry.

Berry and Nelson were both striving for this desired result. In actual practice, Nelson abandoned the double-iron strut and went to the single-iron strut. When Nelson put in the single-iron strut, it pressed the skirt segments in the middle, and when he made drawings of two- and four-iron struts, he still kept them just as near the center as he could in order to press the skirts in the middle. For practical purposes, Nelson's two- and four-iron struts were as bad as the single strut, because they were all out in the middle. They hit directly opposite the point where the cylinder should hit the thrust surface. It is plain that a piston is bad which has the strut so placed that the 400 pounds of side thrust pressure is going to be exerted right opposite that rigid end of the strut. Such a piston is certain to give bad results.

The Berry piston is easier to cast. If that were all, it would not be enough. In addition to being easier to cast, it furnishes great advantages after it is manufactured. Berry picked one of these old elements from one old combination, and another old element from another old combination, and put them into a new combination.

All of these things which I have mentioned are entirely independent of the so-called hoop action, which is probably present to some degree in all pistons. This was brought in by plaintiff on prima facie to show the action in a piston whose skirt is separated from the head in the regions of the thrust faces by semi-circumferential slots and relieved in the regions of the bosses, whereby upon heating of the head to a higher temperature than the skirt, the skirt will be pushed out in the regions of the bosses and drawn inward in the regions of the thrust faces. Such action in such pistons was known to those skilled in the art prior to Berry's filing date and was described in the Jardine and Jehle publication, plaintiffs' exhibit 316. That simply involves the explanation of the action of a piston, whether it be the pistons of the prior art, the Berry piston, or the accused pistons. Hoop action is a difficult thing to locate and measure. They do not figure it out in making the piston. I do not think that the complicated theory of coning has ever helped anyone invent a piston. The men who have invented these pistons have not done it because of their knowledge of coning. From tests made after the piston has been invented, measurements and temperatures are taken and many theories are developed which help no one and simply tend to confusion. The experts have not dared to state in advance what a proposed experiment would prove. After the experiment, they suggest a theory for the result obtained. If it moves one way, the coning theory is used to explain, and if it moves the other way it is explained by the hoop stretch action.

Defendants' pistons alleged to infringe the Berry patent are three in number, namely, Exhibit 302, the Packard narrow strut, Exhibit 303, the Dodge wide strut, and Exhibit 304, the Autothermic piston. In the narrow strut piston a pair of narrow struts are buried intermediate their ends in the piers above the wrist pin bosses, and at their ends are buried in the skirt sections. A band connects the skirt section at the bottom and this band is also connected with the piers below the bosses. In the Dodge wide strut piston a pair of wide struts are buried intermediate their ends in the piers and aluminum ties on both sides of the strut incline downwardly from the piers to the skirt segments. In the Autothermic piston these aluminum ties extend only on the outside of the struts and there is an additional connection between the bottom band and the piers.

Undoubtedly there is some thermostatic action present in the Dodge and Autothermic pistons. I know that if you fasten together two metals of unequal coefficients of expansion and heat them, the one with the greater coefficient of expansion is go-

ing to win the race and bend the two in the direction of the one with the lower coefficient. I know if you put the two together hot, and let them cool, the bending will be in the opposite direction. That is not the sort of thing which led to this invention. Berry made a piston, and he had a poor connection for his struts with the bosses and skirts. He was not inventing a connection. He was thinking about something much bigger and different than that. A man who makes a worthwhile invention and shows a tack where he ought to have used a spike to put two things together, ought not to lose his invention if it is a structure in which any skilled mechanic would use the spike if the tack did not hold. An inventor does not make a model like he would make an article for the market. He has a right to rely on the mechanic to do the things not involved directly in the invention. Berry did not claim any invention in the manner of attaching the struts to the bosses and to the skirts. Berry is entitled to his new combination, and a structure infringes which uses the combination without regard to the particular method of embodying the struts in the bosses or the particular method of attaching the struts to the skirts. Berry's combination includes the struts, the material to be used in the struts, where the ends of the struts should be attached to the skirt segments and showed that the center portion of the struts should be embedded in the bosses. That was his invention and anyone who uses it infringes, no matter how the struts are attached at those particular points to the skirts or how they are embedded in the bosses.

In this case, I am not concerned with the question of whether Nelson improved the connection shown by Berry or whether Nelson secured a good patent on his connection. Defendants used what Berry had invented. They simply remedied Berry's defective connection. Nelson went first to the Packard narrow strut then over to the aluminum ties in the Dodge wide strut and then to the Autothermic piston, trying to get a good and solid connection, and he has succeeded in doing it. He has done a good job of hitching the struts to the skirt segments and embodying the struts in the bosses. He has put these good attachments on Berry's structure, and therefore infringes. The iron in the struts of defendants' pistons regulates the advancement of the thrust surface towards the cylinder in the manner invented by Berry. Even though there is some thermostatic action which is helpful in defendants' piston, nevertheless it is the iron with the lesser coefficient that produces that result.

The evidence shows (see plaintiffs' Exhibit 412) that the coefficient of expansion of iron is $5.6 \times 10^{-6}$, of ordinary steel $6.3 \times 10^{-6}$ and of aluminum about $11.1 \times 10^{-6}$. The coefficient of expansion of the composite of the Autothermic piston is $7.8 \times 10^{-6}$ which is less than that of some steels, and is 70% that of aluminum and 1.4 times that of cast iron. The coefficient of expansion of the composite of the Dodge wide strut piston is 57% that of aluminum. The coefficient of expansion of ordinary steel is about 57% that of aluminum. Accordingly, the coefficient of expansion of either the Dodge or the Autothermic is substantially "smaller than that of the metal in the head part" as described in claim 5 of the Berry patent.

The iron in one side and the aluminum in the other side of the strut of the so-called thermostatic piston causes the strut to move the thrust surface outwardly less and more slowly under increasing temperature than it would if it were all-aluminum. There is no question about that or any claim to the contrary. There are some figures resulting from the tests which squint towards thermostatic action. If there is thermostatic action, it results from the lower coefficient of the iron as compared with aluminum. The figures obtained from the experiments in this case are so small that a bad job of measuring, or a difference in measuring tools, might cause a different result. I am not condemning small differences, because we are dealing with a thing that has to be very exact. But the point is, as I see it, that here in the Berry patent was a good, new and useful combination. The defendants have made use of that combination. The iron is in the defendants' strut at the very place that Berry has it in his patent, and it is because of its lesser coefficient of expansion that it does the trick.

Therefore, I say that the defendants by taking Berry's struts and putting some aluminum along the side of them ought not to avoid infringement, even though there is some thermostatic action present as a result.

It seems plain to me that the reason the aluminum was put in by defendants was to make a better holding joint than

Berry had. There are different ways of attaching the struts. Defendant has used one good way of anchoring Berry's strut to the boss and to the skirt and it is a better way than the one shown by Berry.

Speaking of the iron as water and the aluminum as land, Berry showed thrust surfaces of aluminum which have been called islands. There is nothing in his patent which ought to limit him to that construction, any more than he should be limited to a corrugated strut because he showed that kind of an iron strut.

The law does not impose such misfortune upon a patentee. Paper Bag Patent Case, 210 U.S. 405, 418, 28 S.Ct. 748, 52 L.Ed. 1122; Smith v. Snow, 294 U.S. 1, 11, 55 S.Ct. 279, 79 L.Ed. 721; Allied Products Corp. v. Whitman & Barnes, 21 F.Supp. 186, 193, this court.

 One who applies for a patent should illustrate by his drawings and specifications sufficiently so that one that reads it can tell what it is he claims to have invented. The claims should be supported by the specifications and drawings. If the claims are clear, then they should not be limited to the particular things shown in the specifications which are not part of the combination and are used only for the purpose of explaining the invention. Neither should he be limited to a particular thing simply because he says he prefers it. For example, Berry says in his specifications that he prefers a strut made of material with a coefficient of expansion equal to, or less than, the coefficient of expansion of the material out of which the cylinder is made. When he came to draw his claims, he made the claims for a strut with a coefficient of expansion less than the coefficient of expansion of the balance of the piston. He was entitled to make that broad claim and it should be sustained. It was supported by the specifications. Even though the conclusion should be reached that this is a paper patent, I know of nothing that would take away from it what is new and useful and plainly described in the claims.

 The claims in issue describe Berry's invention as distinguished from the prior art. Claims 5 and 18 specify the struts connecting the skirt segments as being "embedded" or "buried" in the wrist pin bosses or bearings. Claim 15 specifies these struts as "extending transversely of the piston pin bearings uniting the sections to each other and to the head." Claim 35

specifies "each strut being surrounded by the material of a pier." Claim 5 specifies the "members" (struts) as being "made of a metal having a thermal co-efficient of expansion smaller than that of the metal in said head-part." Claim 15 specifies them as being "steel struts" and claim 18 as being of "relatively inexpansible material." While claim 35 does not specifically describe the struts as being of different metal than the balance of the piston and of relatively inexpansible material, they are described as separate elements of the new combination, and it is elemental that a claim must be construed in connection with the specifications (American Fruit Growers v. Brogdex Co., 283 U.S. 1, 51 S. Ct. 328, 75 L.Ed. 801); and the Berry specifications make it clear that the strut is to be of a material such as steel having a coefficient of expansion smaller than that of aluminum. As is said by the Court of Appeals for this Circuit in Mantle Lamp Co. v. George H. Bowman Co., 53 F.2d 441, 444, where the question was one of the heat conductivity of one of the elements of the claim which was not described in the claims but in the specifications, "To import this limitation into the claim is not to bring in an additional element. It is only to interpret with the aid of the specification one of the words of the claim, so that it may not be thought so broad as to be destructive."

Now as to the question of the skirtband around the bottom, again I say that was not part of his invention. He was not inventing the bottom of the skirt. He showed a particular kind of a skirt, but if one takes Berry's combination and puts it over into one of those old pistons (Maynard patent No. 1,655,968, January 10, 1928) that has a band around the bottom, he has infringed just as much as if he put it in one that did not have the band. The presence of that band at the bottom does not avoid infringement. I don't construe his invention as saying that the iron could be taken off and the aluminum would be intact. Berry had a unit of metal all connected together, and that is what is present in the infringing structures. There was nothing in the prior art that needed to limit him in that respect. If he had a new and useful invention, it would be too bad for him to be now so limited that he could use it only in the particular fittings which he used to illustrate and explain the invention.

In connection with Berry not having done more with his patent, I think that in fairness it ought to be kept in mind that not until October 12, 1938, was it decided finally by the Circuit Court of Appeals for this Circuit that Berry was prior to Jardine as to claims 5 and 15 of the Berry patent. Cleveland Trust Company v. Otto Carter Berry, and General Motors Corporation, 6 Cir., 99 F.2d 517, 519. He started this present suit pending that appeal and prior to that decision. I should not have criticized the delay if he had waited to file this suit until that litigation with Jardine's assignee had been finally terminated.

This leads me to the conclusion and finding that Berry owns the patent; that it is valid; that all four of the claims that are now in suit are valid; and that all four of said claims are infringed by all three of the alleged infringing devices exemplified by plaintiffs' Exhibits 302, 303 and 304.

There will be an interlocutory decree, holding, in accordance with this opinion, for an injunction and an accounting of profits and damages and for costs. Donald L. Quaife of Detroit will be Special Master to take proofs and compute the profits and damages.